# Holmes's Appeal.

1. A partnership was formed in which a father and son jointly held one-fourth; the son died, leaving a widow (his administratrix) and minor children. Under the terms of the partnership the father took the son's share of the fourth. In 1851, shortly after his death, the widow, as administratrix, the children having no guardian, made a settlement under seal with the surviving partners, including the father, by which credits of the son on the firm books were given up to the survivors and a balance agreed to. In 1863, after the children came of age, they filed a bill against the administratrix and survivors for an account by the survivors. *Held*, that the administratrix had the power to make the settlement, and in the absence of fraud the settlement was binding on her and the children, and the account was refused.

2. The consideration of an agreement may be proved *aliunde* by parol if necessary, and may be shown to be different from that expressed.

3. A stale claim is regarded with disfavor in a court of equity.

October 12th 1875. Before AGNEW, C. J., SHARSWOOD, WILLIAMS, MERCUR, GORDON, PAXSON, and WOODWARD, JJ.

Appeal from the Court of Common Pleas, No. 1, of *Allegheny county*: In equity: Of October and November Term 1875, No. 127.

The bill was filed April 17th 1863, by Charles Arbuckle, Margaret Arbuckle, Christiana Arbuckle, Robert Jamieson and Catharine his wife, in her right against Nathaniel Holmes, John Arbuckle, Richard Edwards, William Holmes, executor of George Jackson, deceased, William M. Shinn and William P. Beck, executors of Thomas R. Holmes, deceased, and Margaret Arbuckle, widow and administratrix of Thomas Arbuckle, deceased.

The circumstances which gave rise to this controversy were as follows :—

On the 28th of January 1850, Thomas Arbuckle, John Arbuckle, George W. Jackson, Richard Edwards, Thomas R. Holmes, and Nathaniel Holmes entered into articles of partnership under the firm name of Thomas Arbuckle & Co., in the business of cotton manufacturing, and dealing in goods of that kind, in the cotton mills in Allegheny city, then lately occupied by Blackstock, Bell & Co.; the capital stock, at the commencement, to be $100,000,

in four equal shares; John and Thomas Arbuckle together to con-
tribute one-fourth, each paying one-eighth, George W. Jackson
one-fourth, Richard Edwards one-fourth, and Thomas R. and
Nathaniel Holmes one-fourth, each contributing one-eighth; the
business of the firm to be conducted under the general supervision
and control of Thomas Arbuckle, who was to be the managing
partner, and to receive for his services, so long as he should
act in that capacity, a salary of $1000 per annum, above
his share of the profits.   William Bell was to be manager under
the control of Thomas Arbuckle, and to receive an annual salary
of $1000, and, in the absence of Richard Edwards, to represent his
interest as a partner. . Either Thomas Arbuckle or Bell might be
discharged as a manager upon a vote of partners holding two-thirds
of the capital of the firm.   An account of stock was to be taken
on the first days of January and July in each year, and a state-
ment in writing of the condition of the firm to be made.   The.
partnership to be taken to have commenced on the 26th of Novem-
ber 1849, to continue for five years from the 1st of January
1850, and for such further term as the partners might agree upon.
In case of the death of a partner, his interest to be taken by the
survivors at a valuation to be ascertained by the last balance-sheet
rendered previously to his death, without reckoning any profits or
losses after that time.   But in case any share should be held by two
jointly, on the death of one of them, the survivor, if he so elected,
might take the interest of the deceased owner; but if he did not
so elect, such joint interest might be taken by the firm.   Thomas
and Nathaniel Holmes further agreed to cause to be conveyed to
the firm, by the heirs of N. Holmes, Sen., deceased, a lot of ground
in Allegheny city, described in the agreement, with cotton mill,
&c., on it, in consideration of which the firm covenanted with
Thomas and Nathaniel Holmes to "pay the debts of the late firm
of Blackstock, Bell & Co., of which N. Holmes, Sen., deceased, was
a member, the sum of $85,000, and also to pay the said Holmes
the sum of $15,000 in cash; the said sum of $15,000 to be paid
by the said Thomas and John Arbuckle, and to form part of their
share of the capital stock of said co-partnership, of which payment
the receipt of said Holmes therefor shall be sufficient evidence
and voucher for them, the said Thomas and John, that they have
paid said sum as part of their capital stock."
   On the 28th of January 1850, each partner was credited by
the amount of his share of the capital, each of them having
paid his share in cash, except Thomas Arbuckle, whose share was
paid by a charge of $15,000 in his favor against the administra-
tors, &c., of N. Holmes, deceased, and showing at that date a balance
of $2500 to his credit on the books of the firm.   The firm con-
tinued in operation under this arrangement, and without a change
of its members, until April 8th 1851, when Thomas Arbuckle died

[Holmes's Appeal.]

intestate, leaving a widow, Margaret Arbuckle, and five children, viz.: Charles, aged 18 years; Margaret, 16 years; Catharine, 14 years; John, 12 years, and Christiana, 10 years. Administration of Thomas's estate was granted to his widow. Under the provisions of the articles of partnership, John Arbuckle, who was the father of Thomas, elected to take his share in the firm in trust for the widow and children.

On the 27th of June 1851, Thomas Arbuckle's account was charged on the books of the firm with $10,000, and each of the other shares, including John Arbuckle's, credited by $2500. Each entry of such credit was accompanied by this statement :—

"For the one-fourth of $10,000 (being part of the $15,000 given to Thomas Arbuckle when the company was first formed in consideration of his future services for five years), relinquished or given up by the administratrix of Thomas Arbuckle, deceased, as per agreement of all the parties. John Arbuckle, Sen., representing the one-eighth interest of the estate of Thomas Arbuckle, deceased, as well as his own interest of one-eighth. See agreement."

"These entries all take effect from 1st of April 1851, from which time the interest will date."

After all the entries is the following:—

"The administrators of N. Holmes, deceased, agreed to furnish the company with the services of Thomas Arbuckle for five years from the date of the original article of agreement, for which they agreed to pay him $15,000, and for which he has credit on the books of the company. But the company being deprived of his services, by his death, before any considerable portion of the time transpired, it was and is hereby agreed by and between Margaret Arbuckle, administratrix of Thomas Arbuckle, deceased, and the surviving members comprising the firm of Thomas Arbuckle & Co. * * * and the administrators of N. Holmes, deceased, to charge back to the account of Thomas Arbuckle, deceased, $10,000 of the above sum, and credit the members now composing the firm in proportion to the interest each holds in said company, viz.: John Arbuckle, &c. * * * The said John Arbuckle agrees to give back to the estate of Thomas Arbuckle, deceased, the one-fourth part of the above $10,000 credited to him, and he does authorize the credit of the above-named $2500 to the account of the said Thomas Arbuckle, deceased, which we accordingly do, and charge him. Thomas Arbuckle agreed with T. R. and N. Holmes that they should receive credit for his salary of $1000 per annum, for five years, in consideration in part of the above arrangement, but the company agreed to credit the account of the said Thomas Arbuckle, deceased, with the whole of his salary for the time his services were rendered. This arrangement is agreed to by all the parties in said firm, and Margaret Arbuckle, and administrators of N. Holmes, deceased.        W. NEILLE, Bookkeeper (copy)."

Thomas Arbuckle's account is further credited, of the same date, by his share, one-eighth of the profits up to January 1st 1851; also, by his salary for fifteen months, including the amount theretofore credited to T. & R. Holmes.

Following the credit of the salary is this entry:—

" Thomas Arbuckle and the administrators of N. Holmes, deceased, had a verbal agreement that they should receive credit for his services for five years, at the rate of $1000 per annum; but the administratrix of Thomas Arbuckle, deceased, not being aware of this arrangement, is not willing to relinquish the salary, the company agreed to credit Thomas Arbuckle $1250, and also T. R. & N. Holmes $1250."

Thomas Arbuckle was also credited on the books by the $2500, the proportion of the $10,000 assigned to T. & J. Arbuckle, " according to his (John's) written instructions."

On the — day of July 1851, an agreement under seal was entered into "between Margaret Arbuckle, widow and administratrix of Thomas Arbuckle, deceased, of the first part, and John Arbuckle, George W. Jackson, Richard Edwards, Nathaniel Holmes and Thomas R. Holmes, who survived the said Thomas Arbuckle as partners, &c., under the late firm of Thomas Arbuckle & Co., of the second part."

The agreement recited that at the organization of the firm Nathaniel Holmes being seised, under an agreement with William Bell and William Blackstock, of the real estate, &c., "now belonging to said firm and occupied by them as a cotton factory," with a view to enlist other co-partners agreed, "in order to secure the services, skill, &c.," of Thomas Arbuckle for five years, " to bestow on him by way of bonus, premium or compensation therefor, the sum of $15,000;" and that Thomas Arbuckle was credited with that sum in full of his share of the capital of the firm, leaving a surplus in his favor of $2500; that by a verbal agreement with Thomas Arbuckle, "in consideration of the promises," his salary was to be carried to the credit of T. R. & N. Holmes, and $500, part thereof, had been carried to their credit; that by Thomas Arbuckle's death, before the lapse of any considerable portion of the five years, the firm had been deprived of the advantages, &c., expectant from his skill and services, and thus defeating, to a great extent, the consideration on which the credit was given to him; that John Arbuckle had elected to take the interest of Thomas in the firm, leaving, with assent of the other parties, the credits and profits to be adjusted with his personal representatives. It was then agreed by the administratrix, that in consideration of the premises she would release and transfer to the surviving partners the sum of $10,000, theretofore credited to Thomas Arbuckle, and that the same should be charged back to his account and credited to the surviving partners in proportion to their respective

interests, John Arbuckle representing one-fourth, and John's share to be credited to Thomas's account on the partnership books, "to which the said John has and does hereby fully consent and agree." It was further agreed that the $500 credited to T. R. & N. Holmes, on account of the salary of T. Arbuckle, should be re-transferred to the account of Thomas Arbuckle, and he be credited by the whole amount of the salary; it was further agreed that upon the account so adjusted the whole amount due Thomas Arbuckle above his share of the partnership stock was $6045.79, which was to be satisfied by the notes of the survivors, with interest, which notes "are hereby acknowledged by the said Margaret Arbuckle, administratrix, as aforesaid, to have been received by her in full satisfaction of the balance owing to the said Thomas upon the books of the partnership aforesaid." It was further agreed that corresponding entries should be made on the books of the partnership, and so far as any such entries had been made in conformity with the agreement, they were "mutually ratified and confirmed, and "shall stand and be considered as having been made with the full assent and knowledge of the parties, and with the intent that the same should be binding and conclusive upon them respectively, and so that the same shall not, at any time hereafter, or upon any pretence whatever, be overhauled, disturbed or disannulled." The agreement was executed by all the persons above named as parties to it.

The bill, after various allegations, including many of the circumstances as above stated, charged that soon after the death of Thomas Arbuckle the surviving partners, G. W. Jackson, N. Holmes, T. R. Holmes, R. Edwards and W. M. Bell, " combining and confederating together, and contriving to diminish, reduce and injure the interest of the said Thomas in the firm of Thomas Arbuckle & Co., appropriated to themselves, respectively, $7500 of the amount standing as aforesaid upon the books of the said firm to the credit of the said Thomas by debiting his account to that extent, and taking credit to themselves in the following proportions," &c.; that they further debited the account of Thomas with $2500, and credited that amount to the account of John Arbuckle without his consent, but when it came to John's "knowledge he protested against it as being iniquitous and unjust to the estate of Thomas," and caused the said $2500 to be again credited to his estate; that Margaret Arbuckle protested against such spoliation of her husband's interest in the firm, but finally submitted and acquiesced, under threats that if she did not do so the same parties would commit further spoliation of the interest of Thomas in the firm; that at the time the plaintiffs were minors and had no guardians; that none of them were consulted in relation to these transactions, and they had no knowledge of them until a few years before filing the bill.

There were other charges in the bill in relation to the general interest of Thomas Arbuckle in the firm, which it is not necessary to specify.

One of the prayers was that the defendants should be decreed to transfer to the credit of the estate of Thomas Arbuckle, deceased, on the books of the company, "the amount of money and credits standing upon the books of the firm at the death of said Thomas so wrongfully and unjustly distributed and divided to and amongst the said George W. Jackson," &c.

The defendants, N. Holmes, Richard Edwards, W. M. Bell and W. Holmes, answered, amongst other things, denying that they combined to diminish Thomas Arbuckle's interest in the firm, but that they charged back and credited the money mentioned in the bill in accordance with the reasons set forth in the article of agreement of the — day of July 1851; that Charles Arbuckle, one of the plaintiffs, then eighteen years of age, knew of the article of agreement and its intents and purposes; that the $2500 credited to John Arbuckle was in accordance with the agreement of July 1851; it was done with the consent of John Arbuckle, who afterwards relinquished his right to the $2500, and by his direction it was credited to the estate of Thomas Arbuckle; they averred that Margaret Arbuckle did not object to the transfer, but consented to what was done without any threats by the defendants, or any coercion by them or on their behalf.

On the 12th of September 1863, James M. Gallagher, Esq., was appointed examiner and master. He having died, W. G. Hawkins, Esq., was, on the 27th of February 1866, appointed examiner and master in his place.

The testimony was taken by the master on the 19th of December 1873, and the 29th of January and 13th of February 1874. W. Neille, bookkeeper of the firm, testified that he knew of the arrangement as to the $15,000 at the formation of the firm; it was as stated in the articles of partnership, and was given to Thomas as a bonus as stated in the agreement with Mrs. Arbuckle; the other members went in on account of his reputation as a great cotton spinner; Charles Arbuckle was present at the execution of the agreement of July 1851. The entries in the books were made by witness with the consent of all the surviving partners, including John Arbuckle; when Thomas Arbuckle spoke of the entry in the books crediting T. R. & N. Holmes with his salary, he said, "give it to the boys," meaning those two. All the notes given to Mrs. Arbuckle as administratrix, in connection with the settlement, were paid; the agreement was read to her in the presence of her son Charles before she signed. Thomas contributed nothing to the capital except through the credit he received for the $15,000 as a bonus.

The master, September 16th 1874, reported the facts substantially as above stated.

He stated as his opinion that the bonus of $15,000 should not be apportioned, and in support of his opinion said:—

"When the offer of a bonus was made to Thomas Arbuckle, he had already acquired a reputation and a fortune as a cotton spinner, and retired, as he intended, permanently, from business to seek and enjoy that rest to which every thoughtful man looks forward. It was therefore natural that he should hesitate, and that it should require strong inducements to persuade him to re-embark in business and risk both fortune and reputation. The Holmes understood and appreciated the value of a name, and therefore made the acceptance of their offer by Mr. Arbuckle the condition precedent to the formation of the proposed partnership. By his acceptance, his name and reputation became identified with the new firm, and whatever benefit or advantage they might bring with them, was secured for the whole term for which it was formed. The name was the consideration for the bonus. They took the risk of his living the whole term. Compensation for services was provided for in another way. The articles provided that he should receive for his services, as general manager of the business of the firm, at the rate of $1000 per annum. This was exclusive of the bonus. In providing for the payment of the bonus, nothing is said about services; but the articles expressly provide that the salary of $1000 per annum shall be for services as general manager; the presumption is that the bonus was intended for another purpose. The entries in the books of the firm lead to the same conclusion. Thomas Arbuckle is there credited with the bonus of $15,000, absolutely and unconditionally as for so much cash paid. It was credited as, and became part of, the assets of the firm. * * * So far as the articles show, it was not intended that Thomas Arbuckle should devote his whole attention to the business of the firm. They provide for substitution in case of inability to attend, &c. Whereas, in the case of William M. Bell, he was required to devote his whole attention to the business of the firm. It will thus be seen that from all the circumstances of the case, from the articles and the books of the firm, the consideration of the bonus given Thomas Arbuckle by N. and Thomas R. Holmes, was his accession to the firm, that his name and reputation had that value and were as to them equivalent to capital stock. What equity, then, have the defendants to overcome this view of the case? The Holmes secured what they sought—the benefit of the name and reputation of Thomas Arbuckle. The firm was announced to the world, and continued for the whole term of the partnership, under the name and style of 'Thomas Arbuckle & Company.' What the actual value of the name was it is not necessary to say, but the value which they put upon it is shown by the fact that without it the

partnership would not have been formed. The Holmes secured more than was contemplated in the original arrangement. They were credited on the books of the firm with two instalments of salary to Thomas Arbuckle, as general manager. So far as the evidence shows, this was a pure gratuity. Nor have the other defendants an equity. They paid no part of the bonus.

"Had it been the arrangement of the parties, that the bonus should be for the services of Thomas Arbuckle as general manager during the whole term of the partnership, it should and would have been expressed in the articles. There is the utmost particularity shown therein on every other subject, but in this there is nothing to sustain the contention of defendants, and every implication in favor of that of plaintiffs.

"The master therefore finds that at the date of the death of Thomas Arbuckle, he had to his credit on the books of the firm, *inter alia*, the sum of $10,000, as bonus, paid by N. and Thomas R. Holmes; that such credit was not subject to abatement for or on account of the death of said Thomas Arbuckle; but as to this, was entire and indivisible, and said firm was accountable for the whole amount thereof to the estate of said decedent.

"If the foregoing finding of the master is right, the agreement of Margaret Arbuckle, as administratrix, and the surviving partners of the firm of Thomas Arbuckle & Co., was collusive and fraudulent, and therefore void, as to plaintiffs, as being without sufficient consideration. It cannot be sustained on the ground of a compromise, because the subject-matter was not a doubtful right. We have shown that the estate was entitled to the whole amount of the bonus; the partnership was solvent and the claim not in jeopardy, the administratrix therefore could not accept less than the whole amount, because there could be no consideration for the acceptance of less.

"The master, therefore, further finds that the debt to the estate of Thomas Arbuckle, deceased, of the sum of $10,000, and the credit thereof to the surviving partners of the firm of Thomas Arbuckle & Co., individually, on the books of said firm, was as between defendants collusive, and as against plaintiffs void, and that defendants by their said action have become trustees, *ex maleficio*, for plaintiffs." * * *

He recommended that it should be decreed that the defendants, other than Margaret Arbuckle, were indebted to Thomas Arbuckle's estate in the sum of $7500, with interest from January 1st 1852, and that they pay that sum to Margaret Arbuckle as administratrix of Thomas Arbuckle, deceased.

Exceptions were filed to the master's report, which were overruled by the Orphans' Court, and the report was confirmed April 15th 1875.

The court further decreed :—

[Holmes's Appeal.]

" That said defendants, other than said Margaret Arbuckle, are indebted to the estate of Thomas Arbuckle, deceased, in the sum of seven thousand five hundred dollars, with interest thereon from the first day of April 1851, being the amount wrongfully appropriated by said George W. Jackson, Thomas R. Holmes, Nathaniel Holmes and Richard Edwards, surviving partners of the late firm of Thomas Arbuckle & Co., to themselves out of the assets of the estate of said Thomas, amounting, principal and interest, to the sum of seventeen thousand and ninety-seven dollars and fifty cents.

" That said defendants, other than said Margaret Arbuckle, forthwith do pay said Margaret Arbuckle, administratrix of said Thomas Arbuckle, deceased, said sum of seventeen thousand and ninety-seven dollars and fifty cents and interest thereon from the date of this decree until the same is fully paid.

" That said defendants, other than the said Margaret Arbuckle, do pay the costs of this suit," &c.

The defendants appealed to the Supreme Court, and assigned the decree for error.

*H. Burgwin*, for appellants.—Agreements such as that sought to be avoided here can be set aside only for fraud and collusion: Lindley on Partnership, sect. 794; Davis *v.* Davis, 2 Kern 534; Rowley *v.* Adams, 7 Beavan 395. The arrangement being in the settlement of disputed claims, and there being no proof of fraud, will be sustained by the court: Bruner's Appeal, 7 P. F. Smith 46.

*G. P. Hamilton*, for appellees.—Surviving partners are trustees: Collyer on Partnership, sects. 129, 130. Transactions between trustees and beneficiaries must be carried on in the utmost good faith—there must be no concealments and no misrepresentation: Campbell *v.* McClain, 1 P. F. Smith 203; Diller *v.* Bruchbaker, 2 Id. 498. To establish a claim by one holding a fiduciary relation to another against his person or estate, the burden both as to its fairness and consideration is on the claimant: Wistar's Appeal, 4 P. F. Smith 60. An administrator is a trustee simply, and is bound to apply the estate of decedent to the payment of his debts and the surplus according to the intestate laws : Scott on Intestates 549 ; McCandless' Estate, 11 P. F. Smith 9; Abbott *v.* Reeves, 13 Wright 505. It may be laid down as a general principle that a purchaser or receiver of property from a trustee, with notice of the trust, is, in equity, bound by the trust to the same extent as the person from whom he purchased or received: Hill on Trustees 164; Bank *v.* Tyler, 3 W. & S. 373; Goepp's Appeal, 3 Harris 428; Pierce *v.* McKeehan, 3 W. & S. 280.

. [Holmes's Appeal.]

Mr. Justice SHARSWOOD delivered the opinion of the court October 25th 1875.

It is not necessary that we should discuss the question which has been raised on the jurisdiction of the court to entertain the bill and to make the decree which they did in this case. We are of opinion that the plaintiffs have failed to make out their equity to any relief.

It is an undisputed fact that Margaret Arbuckle, in July 1851, by an agreement under seal, with the surviving members of the firm of Thomas Arbuckle & Co., did make a final arrangement and settlement of his claims upon that firm. She was his widow and administratrix, and, therefore, in law authorized to make such a settlement. Nor is it denied that if the recital of facts contained in that was true, the settlement was a perfectly fair and equitable one, and would be binding on the estate. Those facts are endorsed as true, not only by the administratrix, but by the surviving members of the firm, including John Arbuckle, the father of Thomas Arbuckle, and who by the terms of the articles of copartnership, was jointly interested with his son in one-fourth of the capital stock, having paid his share of the said one-fourth in cash, and having the right under the articles, upon the death of ' Thomas, to take the interest of the deceased in the share at the value thereof, as ascertained, and who actually did elect to take the share in trust for the family of his deceased son.

The master, however, found and reported that this agreement of the administratrix was collusive and fraudulent—that is, if the words have any meaning that she conspired with the surviving partners to defraud the estate of her deceased husband—to defraud her children, the plaintiffs in this case, and deprive them of their legal rights. Where is the evidence of this ? That any fraud was practised upon her to induce her to sign the agreement, there is not a spark of evidence. It was read to her, and there is no evidence that she did not understand it. The presumption is, from her relation to the deceased, that she knew that the principal fact recited in the agreement was true, to wit, that the bonus of fifteen thousand dollars was bestowed on her husband, Thomas Arbuckle, in order to secure his services, skill and co-operation for the five years the partnership was to continue. It is not shown that she was personally to derive any benefit or profit from the agreement. She was not only absolutely without any motive to commit such a fraud, but her interest was altogether in the opposite direction.

The master grounds his finding of fraud and collusion—not upon any evidence—but upon an inference drawn from the articles of co-partnership, that the fifteen thousand dollars allowed to Thomas Arbuckle was to be for his name, not his services; and his name the firm used and had the advantage of during the whole five years of its agreed duration. But this is so clear that it cannot

be explained by evidence *aliunde?*   Thomas R. Holmes and Nathaniel Holmes convey to the firm all the real estate, engines and machinery, and in consideration thereof the firm contracts to pay of the debts of the firm of Blackstock, Bell & Co., the sum of eighty-five thousand dollars: "and also to pay the said Holmes the sum of fifteen thousand dollars in cash.   The said sum of fifteen thousand dollars to be paid by the said Thomas and John Arbuckle and to form part of their share of the capital stock of said co-partnership, of which payment the receipt of the said Holmes therefor shall be sufficient evidence and voucher for them, the said Holmes and John, that they have paid said sum and part of their capital stock."   There is certainly nothing in this to indicate what consideration moved the other partners to make this grant to Thomas and John Arbuckle; and that John Arbuckle paid his full share of $12,500; and the full amount of $15,000 was credited to Thomas, was evidently an arrangement between the father and son with which the other partners had nothing to do.   John Arbuckle probably gave to his son Thomas his half of the bonus.   Nor is the provision that Thomas was to be paid a salary of $1000 for his services as managing partner, entitled to conclusive weight.   Skill and knowledge in the art or mystery of cotton spinning were different things from labor and responsibility as managing partner, and might well be separately compensated. Why Thomas Arbuckle ordered his salary to be credited to the Holmes has not been explained.   It may have been a mere gratuity, but it is more probable that it was the result of a private understanding between the parties.

Nothing is better settled than that the consideration of an agreement may be proved *aliunde* by parol if necessary, and even shown to be different from that expressed.   Here, then, we have the solemn declaration of Margaret Arbuckle, under her hand and seal, together with the other members of the firm as to what was in truth the consideration of the bonus, made at a time when all the circumstances were recent and fresh in memory.   This is confirmed by the testimony of William Neille, who was the confidential clerk of the firm and cognisant of all their transactions as to his understanding.   Nor is it conclusive against that testimony that, after so long a lapse of time, he cannot state with particularity the sources of his knowledge.   At the time the proofs were taken, Margaret Arbuckle was a competent witness for her husband's estate, and so was Charles Arbuckle, one of the plaintiffs, who was sixteen years old at the time of the settlement, and present at the execution of the agreement by his mother.   Yet neither of these persons are offered as witnesses to show any fraud or collusion. The master reports that John Arbuckle did not concur in the arrangement between the other partners by which the estate of Thomas Arbuckle was debited with the sum of ten thousand dol-

lars, but says: "John Arbuckle repudiated the entry." We see nothing in the evidence to maintain this finding. John Arbuckle's name and seal are to the agreement of July 1851. That the amount credited to him was charged back by his order was entirely of a piece with his generous conduct throughout towards his son and his son's family. No doubt he intended to do this when he executed the agreement, and it is one of the facts necessary to sustain the plaintiff's case hardest to believe, that with no contemplated advantage to himself, he should have conspired with the other partners in an act of spoliation of his own grandchildren.

This is a very stale claim, and as such not regarded with favor in a court of equity. There was no concealment of the transaction. Charles Arbuckle, one of the plaintiffs, was present when the agreement was read to his mother and executed by her, in July 1851. Yet no proceedings are instituted until April 1863, nearly twelve years after it. The case drew its slow length along eleven years before the master's report was made and the decree entered. We are of the opinion that the plaintiffs have failed to show any equity to support the decree.

Decree reversed, and now it is ordered that the bill be dismissed; the appellees to pay the costs below and of this appeal.